Rel: September 6, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## SPECIAL TERM, 2024

---

### SC-2023-0603

---

**Sheri Sawyer, as the personal representative of the Estate of Thomas Randall Sawyer, Jr., deceased**

**v.**

**Cooper Tire & Rubber Company**

**Appeal from Mobile Circuit Court
(CV-20-900690)**

COOK, Justice.

This is a product-liability action.  Sheri Sawyer ("Sawyer"), as the

personal representative of the Estate of Thomas Randall Sawyer, Jr., deceased, sued Cooper Tire & Rubber Company in the Mobile Circuit Court following a single-vehicle accident in Mobile County, in which her son, Thomas, was killed. The accident occurred after one of the tires on the vehicle in which Thomas was a passenger experienced a tread separation. The tire was allegedly manufactured by Cooper Tire and purchased in Alabama by Barbara Coggin ("Coggin"), an Alabama resident and the mother of the driver, Joseph Daniel Coggin, who was also an Alabama resident.

Cooper Tire moved to dismiss Sawyer's action for lack of specific personal jurisdiction based on its lack of sufficient suit-related contacts with Alabama. In other words, Cooper Tire argued that Alabama courts do not have authority to decide Sawyer's claims.

In response to that motion, Sawyer argued that her claims against Cooper Tire -- a national tire manufacturer with a significant dealer network in Alabama -- "arise out of or relate to" its contacts with Alabama, which, she argued, were established through its sale, distribution, and advertising of the particular tire model at issue in Alabama.

2

While Cooper Tire's motion was pending, the United States Supreme Court issued its decision in Ford Motor Co. v. Montana Eighth Judicial District Court, 592 U.S. 351 (2021), in which it recognized that, in a product-liability action, a forum state may exercise specific personal jurisdiction over an out-of-state defendant even when there is not a direct causal relationship between the defendant's contacts with the forum state and the injury. The Court explained that jurisdiction can exist if the claim "'arise[s] out of or relate[s] to'" the defendant's contacts with the forum state. Ford, 592 U.S. at 362 (citations omitted). The Court wrote that a claim that "relates to" a defendant's contacts with a forum state could include circumstances in which the defendant "systematically served a market in [the forum state] for the very [product] that the plaintiffs allege malfunctioned and injured them" in that state, even when the plaintiffs cannot show that the defective product was purchased there. Id. at 365.

Afterward, the parties filed supplemental briefing addressing Ford, and the trial court proceeded with holding a hearing on Cooper Tire's motion to dismiss. Following that hearing, the trial court granted Cooper Tire's motion. Among other things, the trial court concluded that it could

not exercise personal jurisdiction over Cooper Tire because (1) Sawyer had failed to show that Cooper Tire had sold, distributed, and marketed the particular tire model at issue in Alabama in the three years before the underlying accident and (2) Sawyer and her son were not Alabama residents and, thus, Alabama had "less of an interest" in providing a forum for her action against an out-of-state defendant. Sawyer appealed.

As explained below, we conclude that the Supreme Court's decision in Ford is binding in this case. After applying the analytical framework from Ford to the facts in this case, we hold that Cooper Tire's unrefuted sale, distribution, and advertising in Alabama of the particular tire model at issue "relate to" Sawyer's claims against it and, thus, that specific personal jurisdiction exists in this case. As a result, we further hold that the trial court's findings concerning the timing of Cooper Tire's contacts with Alabama before the underlying accident and Sawyer's place of residency are not dispositive of the jurisdictional question here. We therefore reverse the trial court's judgment dismissing Sawyer's action and remand this case for proceedings consistent with this opinion.

## Facts and Procedural History

### I. The Accident and the Underlying Lawsuit

On March 31, 2018, Thomas, a Florida resident, was traveling through Mobile County in a 2004 GMC Envoy driven by Joseph. As stated previously, the Envoy was owned by Joseph's mother, who had purchased the vehicle, including its tires, in Alabama.

During the trip, the vehicle's right rear tire -- a CS4 Touring tire, size P235/65R17 ("the subject tire") -- experienced a tread separation. As a result, it instantly became "unstable and uncontrollable," and, as Joseph attempted to steady it, the vehicle struck a ditch and flipped over. Thomas died in the crash.

On March 24, 2020, Sawyer, a Florida resident and the personal representative of Thomas's estate, filed suit against Cooper Tire in the Mobile Circuit Court.[1] In her complaint, Sawyer alleged a series of product-liability, negligence, wrongful-death, and breach-of-warranty claims against Cooper Tire for which she sought damages.

Sawyer alleged that Cooper Tire was subject to personal jurisdiction in Alabama because, she said, her claims "relate to Cooper Tire's contacts with the State of Alabama." Among other things, her

---

[1]Sawyer also sued Joseph. However, he was later dismissed from the action and, thus, is not a party to this appeal.

complaint alleged:

"5.    Defendant Cooper Tire is a for-profit corporation, which was engaged in business in the State of Alabama through the distribution of its products in the stream of commerce, and whose defective product did injure [Thomas] in the State of Alabama. Defendant Cooper Tire manufactured, assembled, marketed, warranted and placed in the stream of commerce the Cooper CS4 Touring tire P235/65R17 ('Subject Tire') which caused harm and injury to [Thomas] in the State of Alabama.

"6.    Cooper Tire sells its passenger and light truck tires, including the Subject Tire Model, to distributors and retailers throughout the State of Alabama.

"7.    According to the Cooper Tire website, Cooper Tire maintains a tire dealer network comprised of approximately 324 Cooper Tire dealers across 117 cities throughout the State of Alabama.

"….

"9.    Cooper Tire actively collected warranty information and tire failure data within the State of Alabama from Alabama consumers. Cooper Tire uses this information when creating and modifying the design of its tires, including the failed Subject Tire.

"….

"12. Cooper Tire conducted extensive advertising and marketing campaigns for its passenger and light truck tires, including the Subject Tire model, that reached consumers in the State of Alabama and connected Alabama consumers with the closest Cooper Tire dealer.

"13. Cooper Tire's advertising also includes Cooper Tire

sponsorship for the Southeastern Conference (SEC) Basketball tournament for the University of Alabama collegiate basketball program; Cooper Tire sponsorship for the 'Cooper Tire Performer of the Week' for the University of Alabama collegiate sports program; Cooper Tire sponsorship for an Alabama football blog; Cooper Tire sponsorship of the Bassmaster Elite Series, which is headquartered in the State of Alabama; and Cooper Tire sponsorship for the Paul Finebaum sports talk show, which broadcasts in the State of Alabama. …"

(Emphasis added.) Her complaint also alleged the following:

"111. At all materials times, Cooper Tire has collectively been engaged in the manufacture, sale, and distribution of automobile tires and has sold, distributed, and otherwise place[d] such products into the stream of commerce in the state of Alabama.

"112. Prior to the date of the incident giving rise to this litigation, Cooper Tire had manufactured, sold, and distributed automobile tires into [the stream of] commerce in the state of Alabama having the following specifications: a Cooper Tire tubeless radial bearing the name Cooper Tire CS4 Touring P235/65R17."

(Emphasis added.)

II. Cooper Tire's Motion to Dismiss

On August 21, 2020, Cooper Tire moved to dismiss Sawyer's claims against it for lack of personal jurisdiction. Because it was undisputed that Cooper Tire was not subject to general personal jurisdiction in Alabama, Cooper Tire's motion focused on the arguments for why specific personal

7

jurisdiction did not exist for the claims by Sawyer.[2]

In its motion, Cooper Tire admitted that it was "like many companies whose products are placed into the stream of commerce and distributed nationally" and that it had purposefully availed itself of the privilege of conducting business in Alabama. However, relying on Hinrichs v. General Motors of Canada, Ltd., 222 So. 3d 1114 (Ala. 2016), in which a plurality of our Court held that specific personal jurisdiction cannot be exercised when an allegedly defective product is not sold in Alabama by the out-of-state defendant, Cooper Tire asserted that Sawyer had neither pleaded nor shown that it had sold the subject tire on Coggin's vehicle in Alabama. In other words, Cooper Tire argued that there was not a direct causal connection between its contacts with

---

[2]Specifically, it was undisputed by the parties that the trial court could not exercise general personal jurisdiction over Cooper Tire because Cooper Tire is incorporated in Delaware and has its principal place of business in Ohio. See Pruitt v. AAA Interstate Transp., LLC, 358 So. 3d 1144, 1149 (Ala. 2022) (recognizing that a defendant is subject to general personal jurisdiction only in states where it is "essentially at home" and explaining that, for a corporate defendant, that typically means only the state in which the defendant is incorporated and the state in which it has its principal place of business (citing Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011), and Daimler AG v. Bauman, 571 U.S. 117, 139 & n.19 (2014))).

Alabama and the claims in this lawsuit. Accordingly, Cooper Tire argued that Sawyer had failed to meet her burden of establishing that the trial court could exercise specific personal jurisdiction over it and, thus, that her claims against it were due to be dismissed.

In support of its motion, Cooper Tire attached the affidavit of Nicole K. Schwieterman, who was the corporate counsel for the company. In her affidavit, Schwieterman stated that she was familiar with Cooper Tire's business operations and admitted that, for the years 2017, 2018, and 2019, "approximately 1% of Cooper Tire's nationwide unit sales were made in Alabama." Although she admitted that Cooper Tire manufactured the CS4 Touring tire P235/65R17, she explained that the CS4 Touring tire was made by Cooper Tire only from 2007-2014 and was never sold to General Motors -- the manufacturer of the 2004 GMC Envoy involved in the underlying accident. She also noted that Sawyer's complaint did not provide the Department of Transportation tire-identification number of the subject tire so that Cooper Tire could verify (1) whether it had manufactured that tire or (2) when and where that tire had been manufactured.

On October 21, 2020, Sawyer filed an opposition to Cooper Tire's

motion and served Cooper Tire with a jurisdictional discovery request to help establish the existence of the contacts between Cooper Tire and Alabama.[3]

However, after filing the above documents, Sawyer notified the trial court that the exact jurisdictional issue raised by Cooper Tire was pending before the United States Supreme Court in <u>Ford Motor Co. v. Montana Eighth Judicial District Court</u>, 592 U.S. 351 (2021). Given the factual and legal similarities between <u>Ford</u> and the present case, Sawyer asked the trial court to defer ruling on Cooper Tire's motion until after the Supreme Court issued its decision in <u>Ford</u>.[4]

---

[3]In that request, Sawyer asked Cooper Tire to, among other things: (1) disclose how many CS4 Touring tires were sold annually in Alabama between 2017 and 2019 and (2) disclose the total sales of that type of tire in Alabama. Sawyer also asked Cooper Tire to "[p]roduce all written agreements concerning advertising funds related to the marketing or advertisements of Cooper products in Alabama to the extent that such agreements were in force at any time from 2015 to the present and were either executed in Alabama or agreed by persons or corporate entities in Alabama." Finally, Sawyer asked Cooper Tire to admit that, in the last three years, it had advertised in Alabama and collected adjustment and/or tire-failure data about tires that had failed or had been returned in Alabama.

[4]Among other things, Sawyer attached to her request a copy of the transcript from the oral argument held by the Supreme Court in the <u>Ford</u>.

On October 23, 2020, the trial court issued an order in which it agreed to defer ruling on Cooper Tire's motion until after the Supreme Court issued its decision in <u>Ford</u>. It also agreed to stay further discovery in the action pending its final ruling on Cooper Tire's motion.

III. The Supreme Court's Decision in <u>Ford</u>

On March 25, 2021, the Supreme Court issued its decision in <u>Ford</u>. In the consolidated suits at issue in <u>Ford</u>, as explained in detail below, two plaintiffs had been injured in vehicles manufactured by Ford. Ford moved to dismiss those suits on the basis that the forum states lacked personal jurisdiction over it because the subject vehicles were not originally sold in the forum states.

The Supreme Court rejected Ford's assertion, emphasizing that jurisdiction can exist if injuries either "'arise out of <u>or relate to</u>'" the defendant's forum contacts. <u>Id.</u> at 362 (citations omitted). Because Ford conducted so much business in the forum states and because those activities "related to" the plaintiffs' claims against it -- including marketing, selling, and servicing "the very vehicles that the plaintiffs allege[d] malfunctioned and injured them in those States" -- the Supreme Court held that it was fair and foreseeable for the courts in the forum

11

states to exercise specific personal jurisdiction over Ford. Id. at 365.

IV. The Parties' Supplemental Briefing in Light of Ford

Following the issuance of the Supreme Court's decision in Ford, on January 27, 2022, both parties filed supplemental briefs on the impact of the Ford decision. In support of her supplemental brief, Sawyer attached, among other things, a copy of a portion of Joseph's deposition, a copy of the accident report, and a copy of the "Carfax" report showing that the 2004 GMC Envoy's ownership history, maintenance history, and accident history all occurred in Alabama.

V. The Trial Court's Order Directing the Parties to Conduct Limited Discovery

After the parties submitted their supplemental briefs, on May 26, 2022, the trial court held a hearing during which it heard arguments from the parties regarding the impact of the Ford decision as well as the need for additional jurisdictional discovery. Following that hearing, on May 27, 2022, the trial court issued an order in which it directed the parties to conduct limited discovery to establish (1) the state in which the subject tire was purchased and (2) whether, in 2015, 2016, 2017, and/or 2018, Cooper Tire generally sold the CS4 Touring tire in Alabama. Neither party raised any objections to the trial court's order.

On June 16, 2022, Sawyer's counsel filed a copy of an affidavit from Coggin, Joseph's mother. Coggin's affidavit stated, among other things, that she was the owner of the 2004 GMC Envoy involved in the underlying accident and that she had "purchased the subject tire at issue in this lawsuit" in Alabama. She further stated that "[a]ny tire [she] ever purchased for the 2004 GMC Envoy was purchased in the State of Alabama" and that "[a]ll maintenance for the 2004 GMC Envoy was done exclusively in the State of Alabama." Although she stated that she "[could not] be certain as to where and when the subject tire was purchased," she also stated that she "routinely purchased tires from A1 Tire Store located in Semmes, Alabama or the Wal-Mart store located in Semmes, Alabama" and that "[t]hese locations sell Cooper Tires."

Cooper Tire then filed a copy of an affidavit from Craig Marks, the "Lead Professional for Distribution & Operations Planning" for Cooper Tire. In his affidavit, Marks explained (1) that Cooper Tire did not sell the CS4 Touring tire as "original equipment to GM" -- the manufacturer of Coggin's vehicle -- and (2) that, although Cooper Tire "shipped approximately 5,000 Cooper CS4 Touring size P235/65R17 tires to other states from 2015-2018, including California, Texas, New York, and

13

Pennsylvania," it "did not ship any of those tires to Alabama." (Emphasis added.) Marks further explained that he had "reviewed the shipping records with ship-to addresses in Alabama and located no records indicating that Cooper tire shipped any tires of any brand or size to either the A-1 Tire store in Semmes, Alabama or the Wal-Mart in Semmes, Alabama from 2015-2018."

In addition to Marks's affidavit, Cooper Tire also submitted a copy of the GMC Envoy's "Alabama Vehicle Title History," which purported to show that Coggin had purchased the vehicle in Alabama in 2016.

VI. The Trial Court's Judgment Granting Cooper Tire's Motion to Dismiss

Following a final hearing on Cooper Tire's motion to dismiss, on October 18, 2022, the trial court granted the motion and dismissed Sawyer's claims against Cooper Tire after concluding that it lacked specific personal jurisdiction over the company.

In support of its decision, the trial court discussed at length the Supreme Court's recent decision in Ford, supra, as well as this Court's prior decision in Hinrichs, supra, and the United States District Court for the Middle District of Alabama's decision in Tyler v. Ford Motor Co. (Case No. 2:20-CV-584-WKW, Nov. 17, 2021) (M.D. Ala. 2021) (not

14

reported in Federal Supplement) (judgment vacated), and explained that its "specific jurisdictional analysis must focus on whether Cooper Tire's suit-related contacts create a substantial connection with Alabama." Applying the jurisdictional principles of those cases to the facts of this case, the trial court found:

"In this case, a non-resident plaintiff alleges her non-resident decedent suffered an in-state injury caused by an allegedly defective tire manufactured by Cooper Tire. The specific Subject Tire was purchased by Barbara Coggin in Alabama, but there is no evidence Cooper Tire distributed or sold that tire in Alabama. The evidence is Cooper Tire manufactured approximately 5,000 of the Cooper CS4 Touring size [P]235/65R17 tires during 2015-2018. [5] The record reflects that all of those tires were shipped to states other than Alabama. The record also reflects that Cooper Tire neither sold nor shipped to Alabama any Cooper CS4 Touring [P]235/65R17 tires from 2015-2018. Alabama also has less of an interest in asserting jurisdiction over an out-of-state defendant to provide a forum for an out-of-state plaintiff than if the plaintiff was an Alabama resident.

"For all these reasons, [Sawyer] has not met her burden of showing that the connection between [her] claims and Cooper Tire's activities in Alabama is close enough to support

_____

[5]In its judgment, the trial court explained that both the "Carfax" report submitted by Sawyer and the certified "Alabama Vehicle Title History" submitted by Cooper Tire showed that Coggin had purchased the 2004 GMC Envoy in Alabama in early 2016 and that the accident took place in March 2018. Based on that information as well as some of Sawyer's prior discovery requests, the trial court stated that it considered 2015-2018 to be the "relevant timeframe" for the purposes of evaluating Cooper Tire's personal-jurisdiction claim.

specific jurisdiction. It therefore is the JUDGMENT of this Court that Cooper Tire's Motion to Dismiss … should be and is hereby GRANTED."

(Capitalization in original; emphasis added.)

After the trial court issued its judgment, Sawyer filed a motion to alter, amend, or vacate the judgment which was later denied. This appeal followed.

Standard of Review

"A Rule 12(b)(2), Ala. R. Civ. P., motion tests the [trial] court's exercise of personal jurisdiction." Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Allen, 143 So. 3d 784, 787 (Ala. 2014). It is well settled that "'"[a]n appellate court considers de novo a trial court's judgment on a party's motion to dismiss for lack of personal jurisdiction."'" Id. (quoting Ex parte Lagrone, 839 So. 2d 620, 623 (Ala. 2002), quoting in turn Elliott v. Van Kleef, 830 So. 2d 726, 729 (Ala. 2002)).

Discussion

On appeal, Sawyer contends the trial court erred in granting Cooper Tire's motion to dismiss on the basis that it lacked specific personal jurisdiction over the company.

I. Alabama's Long-Arm Rule Extends Long-Arm Jurisdiction to the "Fullest Extent" Under Federal Constitutional Law

16

Our personal-jurisdiction law is coextensive with federal law, and thus we are bound to apply <u>Ford</u>. Our Court has recently reiterated that "[a]n Alabama court may exercise jurisdiction over a defendant served out of state … if doing so is consistent with due process and Rule 4.2(b), Ala. R. Civ. P., which serves the function of Alabama's 'long-arm statute.'" <u>Pruitt v. AAA Interstate Transp., LLC</u>, 358 So. 3d 1144, 1148 (Ala. 2022).[6] That rule "extends long-arm jurisdiction to the <u>fullest extent</u> consistent with due process under the United States and Alabama Constitutions." <u>Id.</u> (emphasis added).

<u>II. Personal-Jurisdiction Allegations in a Complaint Must be Taken as True Unless Controverted by Affidavit Testimony from the Defendant</u>

The parties' respective burdens in a case testing personal jurisdiction are well settled in Alabama:

"'"'The plaintiff has the burden of proving that the trial court has personal jurisdiction over the defendant.'"' <u>Ex parte</u>

---

[6]Rule 4.2(b), Ala. R. Civ. P., provides, in relevant part:

"An appropriate basis exists for service of process outside of this state upon a person or entity in any action in this state when the person or entity has such contacts with this state that the prosecution of the action against the person or entity in this state is not inconsistent with the constitution of this state or the Constitution of the United States ...."

17

McNeese Title, LLC, 82 So. 3d 670, 674 (Ala. 2011) (quoting Ex parte Excelsior Fin., Inc., 42 So. 3d 96, 103 (Ala. 2010), quoting in turn J.C. Duke & Assocs. Gen. Contractors, Inc. v. West, 991 So. 2d 194, 196 (Ala. 2008), citing in turn Ex parte Covington Pike Dodge, Inc., 904 So. 2d 226 (Ala. 2004)).

"'"'"In considering a Rule 12(b)(2), Ala. R. Civ. P., motion to dismiss for want of personal jurisdiction, a court must consider as true the allegations of the plaintiff's complaint not controverted by the defendant's affidavits, Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253 (11th Cir. 1996), and Cable/Home Communication Corp. v. Network Productions, Inc., 902 F.2d 829 (11th Cir. 1990), and 'where the plaintiff's complaint and the defendant's affidavits conflict, the ... court must construe all reasonable inferences in favor of the plaintiff.' Robinson, 74 F.3d at 255 (quoting Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir. 1990))."'

"'"Wenger Tree Serv. v. Royal Truck & Equip., Inc., 853 So. 2d 888, 894 (Ala. 2002) (quoting Ex parte McInnis, 820 So. 2d 795, 798 (Ala. 2001)). However, if the defendant makes a prima facie

evidentiary showing that the Court has no personal jurisdiction, 'the plaintiff is then required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and he may not merely reiterate the factual allegations in the complaint.' Mercantile Capital, LP v. Federal Transtel, Inc., 193 F. Supp. 2d 1243, 1247 (N.D. Ala. 2002) (citing Future Tech. Today, Inc. v. OSF Healthcare Sys., 218 F.3d 1247, 1249 (11th Cir. 2000)). See also Hansen v. Neumueller GmbH, 163 F.R.D. 471, 474-75 (D. Del. 1995) ('When a defendant files a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2), and supports that motion with affidavits, plaintiff is required to controvert those affidavits with his own affidavits or other competent evidence in order to survive the motion.') (citing Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 63 (3d Cir. 1984))."

"'Ex parte Covington Pike Dodge, Inc., 904 So. 2d 226, 229-30 (Ala. 2004).'"

Pennsylvania Nat'l Mut. Cas. Ins. Co., 143 So. 3d at 787-88 (quoting Ex parte Excelsior Fin., Inc., 42 So. 3d 96, 103 (Ala. 2010)) (emphasis added). In sum, the allegations of the complaint govern unless controverted by affidavits from the defendant.

III. Specific-Personal-Jurisdiction Legal Principles

19

Our Court's precedent has been consistent with past Supreme Court precedent on personal jurisdiction. For instance, we have recently stated the following with regard to the degree of contacts that must exist for a trial court to exercise specific personal jurisdiction over an out-of-state defendant:

> "The touchstone of specific jurisdiction is whether the defendant has '"purposefully avail[ed] itself of the privilege of conducting activities within the forum State."' Ford Motor Co. [v. Montana Eighth Jud. Dist. Ct.], 592 U.S. [351] at 352, 141 S. Ct. [1017] at 1024 [(2021)] (quoting Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). … Crucially, specific jurisdiction must be based on '"the defendant's contacts with the forum state that are related to the cause of action"' in the suit at hand, and, though these contacts '"need not be continuous and systematic,"' they must be substantial enough that the defendant could fairly anticipate a suit in the forum state. [Elliott v. VanKleef, 830 So. 2d 726] at 730 [(Ala. 2002)] (quoting Ex parte Phase III Constr., Inc., 723 So. 2d 1263, 1266 (Ala. 1998) (Lyons, J., concurring in the result)); see also Walden v. Fiore, 571 U.S. 277, 284, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014) (stressing that 'the defendant's suit-related conduct must create a substantial connection with the forum State' (emphasis added))."

Pruitt, 358 So. 3d at 1149-50 (first emphasis added).

### A. Our Court's Decision in Hinrichs v. General Motors of Canada, Ltd., 222 So. 3d 1114 (Ala. 2016)

However, in 2016, a plurality of our Court, in Hinrichs, appeared to narrow the circumstances in which an out-of-state defendant's contacts

with Alabama are deemed to "arise out of or relate to" an action. Cooper Tire and the trial court relied, at least in part, on <u>Hinrichs</u>. Because Sawyer asks that we overrule this plurality decision and because it is one of the most recent cases with some of the most extensive analysis of the "stream of commerce" test by our Court before <u>Ford</u>, we must discuss it.

In <u>Hinrichs</u>, Daniel Vinson purchased a vehicle in Pennsylvania that had been manufactured by General Motors of Canada, Ltd. ("GM Canada"). GM Canada manufactured vehicles for General Motors Corporation, its parent company, to distribute to all 50 states in the United States. Hinrichs suffered serious injuries in an automobile accident in Alabama while he was a passenger in a GMC Sierra pickup truck driven by Vinson.

Hinrichs thereafter brought a product-liability action against GM Canada. GM Canada moved to dismiss Hinrichs's complaint based on a lack of personal jurisdiction. The trial court granted that motion.

On appeal, determining whether Alabama could exercise personal jurisdiction over GM Canada, this Court considered

"whether a stream-of-commerce analysis <u>consistent with existing precedent</u> can be applied to uphold specific jurisdiction over GM Canada under the facts of this case. <u>The starting point of the stream of commerce in this case is GM</u>

21

Canada's anticipation of the presence of its vehicles in all 50 states, necessarily including Alabama. But it is undisputed that the stream of commerce for the [GMC] Sierra [pickup truck] ended at its sale in Pennsylvania, approximately 1,000 miles from Alabama.

"....

"Although existing Supreme Court precedent on stream of commerce as a basis for specific jurisdiction is not a model of clarity, it is clear that a majority of the United States Supreme Court has yet to hold that foreseeability alone is sufficient to subject a nonresident defendant to specific jurisdiction in the forum state. This conclusion is consistent with a law-review article quoted with approval in Daimler[ AG v. Bauman, 571 U.S. 117 (2014),] describing International Shoe [Co. v. Washington, 326 U.S. 310 (1945),] as clearly not saying that 'dispute-blind' jurisdiction is appropriate in cases involving specific jurisdiction. 571 U.S. at 138, 134 S. Ct. at 761.

"In Walden [v. Fiore, 571 U.S. 277 (2014),] the United States Supreme Court's most recent pronouncement on specific jurisdiction and the first case in many years to garner a unanimous Court on the subject, the Supreme Court emphatically underscored the requirement that the claim against the defendant have a suit-related nexus with the forum state before specific jurisdiction can attach. The Walden Court left no room for any exceptions. 'For a State to exercise [specific] jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State.' 571 U.S. at 284, 134 S. Ct. at 1121 (emphasis added). Vinson, the owner of the vehicle in which Hinrichs was injured, brought the Sierra to Alabama. However, Vinson's '"unilateral activity of [bringing the Sierra to Alabama, in which GM Canada did not participate,] is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify

22

an assertion of jurisdiction."' 571 U.S. at 284, 134 S. Ct. at 1122 (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 417, 104 S. Ct. 1868, 80 L.Ed.2d 404 (1984))."

Hinrichs, 222 So. 3d at 1138-40 (all but final emphasis added).

In upholding the trial court's conclusion that it did not have specific personal jurisdiction over GM Canada, a plurality of this Court stated that "there simply is no 'suit-related conduct' that creates a substantial connection between GM Canada and Alabama if the vehicle was not sold in Alabama, even though Hinrichs was injured in Alabama." 222 So. 3d at 1141 (citing Walden v. Fiore, 571 U.S. 277, 284 (2014). In other words, a plurality of our Court held that it is only when the defective product is sold in Alabama and that contact results in the plaintiff's injury that specific personal jurisdiction can be exercised over the out-of-state defendant.

### B. The Supreme Court's Decision in Ford

Five years after our decision in Hinrichs, the Supreme Court decided Ford. As explained previously, in that case, two plaintiffs were injured in vehicles manufactured by Ford, and the undisputed facts showed that the vehicles involved in the accidents -- a 1996 Explorer and

23

a 1994 Crown Victoria -- were originally sold outside the forum states.[7]

Those vehicles were eventually resold as used cars to the current owners in Minnesota and Montana.

Ford moved to dismiss those suits on the basis that the forum states lacked personal jurisdiction over it. Although Ford did not dispute that (1) it had purposefully availed itself of the privilege of conducting activities in both forum states and (2) it did substantial business in both forum states, including advertising, selling, and servicing the same models as the vehicles that the suits claimed were defective, it nevertheless argued that each state court had jurisdiction over it only if the company's conduct in those states had directly given rise to the plaintiff's claims. According to Ford, that causal link could be established only if the company had designed, manufactured, or sold the specific vehicles involved in the accidents in the forum states. Because the plaintiffs in each case could not make such a showing, Ford asserted that their lawsuits against it were due to be dismissed.

The trial courts in each forum state denied Ford's motion. The

---

[7]One vehicle was originally sold in Washington and the other in North Dakota.

Supreme Court later granted certiorari review to consider whether Ford was subject to specific personal jurisdiction in Minnesota and Montana.[8]

In its certiorari petition, Ford relied heavily on Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County, 582 U.S. 255 (2017). In Bristol-Myers, a large number of purchasers of an allegedly defective drug sued the drug manufacturer in California state court. Some of those purchasers were residents of California who had purchased the drug in California. However, many of the plaintiffs were residents of other states who had purchased and ingested the drug. The Supreme Court concluded that the claims of those nonresidents, for injuries suffered outside California, based upon sales made outside California, did not "arise out of or relate to" the drug manufacturer's contacts with California because those claims were for injuries and sales that took place outside California. Accordingly, the Supreme Court in Bristol Myers held that there was no specific personal jurisdiction over the drug manufacturer as to the nonresidents' claims. 582 U.S. at 265-

---

[8]The Supreme Court did not address whether Ford could have been subject to the general personal jurisdiction of those courts because, it noted, the parties agreed that general personal jurisdiction would attach only in Delaware or Michigan -- the states in which Ford was organized and had its principal place of business. 592 U.S. at 359.

66.

Ford reasoned that <u>Bristol-Myers</u> precluded jurisdiction when the defective product is sold outside the forum State, "even if the defendant regularly sold 'the same <u>kind</u> of product' in the State." <u>Ford</u>, 592 U.S. at 369 (quoting Ford's reply brief at 2). According to Ford, because the particular vehicles involved in the accidents were not designed, manufactured, or first sold in the states where the plaintiffs' injuries occurred, the necessary "causal link" between it and the forum states could not be established and, thus, the forum states could not exercise specific personal jurisdiction over it.

In considering Ford's argument, the Supreme Court first explained that the Due Process Clause of the Fourteenth Amendment is the basis of the personal-jurisdiction doctrine and that it "limits a state court's power to exercise jurisdiction over a defendant." 592 U.S. at 358. The Court quoted the foundational case of <u>International Shoe Co. v. Washington</u>, 326 U.S. 310 (1945), to explain how the Due Process Clause balances (1) fairness to the defendant, (2) reasonableness, and (3) respect for each state's authority in our federalist system, stating: "[A] tribunal's authority depends on the defendant's having such 'contacts' with the

forum State that 'the maintenance of the suit' is <u>reasonable, in the context of our federal system of government</u>,' and '<u>does not offend traditional notions of fair play and substantial justice</u>.'" 592 U.S. at 358 (quoting <u>International Shoe</u>, 326 U.S. at 316-17) (emphasis added).

In applying this test, the Supreme Court then explained that a defendant must have, at least, purposefully availed itself of the privilege of doing business in the forum state. According to the Supreme Court, this is normally determined by looking to see whether the "contacts" between the defendant and the forum state are of a sufficient nature and whether they are the result of the "defendant's own choice" and are not merely "'random, isolated, or fortuitous.'" 592 U.S. at 359 (quoting <u>Keeton v. Hustler Magazine, Inc.</u>, 465 U.S. 770, 774 (1984)). In other words, the defendant "must take 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State.'" 592 U.S. at 359 (quoting <u>Hanson v. Denckla</u>, 357 U.S. 235, 253 (1958)). <u>See</u> <u>also</u> <u>International Shoe</u>, 326 U.S. at 316 (explaining that a defendant must "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice'" (quoting <u>Milliken v. Meyer</u>, 311 U.S.

457, 463 (1940))).

One example of such purposeful availment, the Supreme Court noted, can be the defendant's cultivating a market, that is "'<u>exploi[ting] a market</u>' <u>in the forum State</u> or entering a contractual relationship centered there." <u>Ford</u>, 592 U.S. at 359 (quoting <u>Walden</u>, 571 U.S. at 285) (emphasis added).

Since Ford conceded that it had purposefully availed itself of the privilege of conducting business in the forum states, the Supreme Court's analysis focused on the next step of the specific-personal-jurisdiction analysis -- that is, whether a sufficient affiliation existed between the forum states, Ford, and the underlying controversies. The Supreme Court in <u>Ford</u> explained that in <u>Bristol-Myers</u>, although the defendant had sold the same product (Plavix) in the forum state (California), the claims of the plaintiffs who resided in other states did not have any connection to California. In other words, there was simply no "activity or occurrence" that took place in California connected to those nonresident plaintiffs. 592 U.S. at 369 (quoting <u>Bristol-Myers</u>, 582 U.S. at 265) (explaining that "'[w]hat is needed -- and what is missing here -- is a connection between the forum and the specific claims at issue'").

Ford's argument focused on the language from <u>Bristol-Myers</u>, quoted above by the Supreme Court, requiring that the suit "'arise out of or relate to the defendant's contacts' with the forum." <u>Id.</u> at 359 (quoting <u>Bristol-Myers</u>, 582 U.S. at 256). In Ford's view, this meant that jurisdiction could attach only in those states "where Ford sold the car[s] in question, or else the States where Ford designed and manufactured the vehicle[s]." <u>Id.</u> at 361. Because none of those things occurred in Montana or Minnesota, Ford maintained that those states "have no power over these cases." <u>Id.</u>

The Supreme Court squarely rejected Ford's causation-only approach and wrote that such an approach "finds no support in this Court's requirement of a 'connection' between a plaintiff's suit and a defendant's activities." <u>Id.</u> (quoting <u>Bristol Myers</u>, 582 U.S. at 256). Further, the Supreme Court noted that "[n]one of [its] precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do." <u>Id.</u> at 362.

Instead, the Court emphasized that the phrase "arise out of or relate to" can also be satisfied if there is a sufficient "'"affiliation between the forum and the underlying controversy."'" <u>Id.</u> at 359 (citations

omitted). Specifically, the Supreme Court explained:

"The first half of that standard ['arise out of'] asks about causation; but the back half, after the 'or[]' ['relate to,'] contemplates that some relationships will support jurisdiction without a causal showing. That does not mean anything goes. In the sphere of specific jurisdiction, the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum. But again, we have never framed the specific jurisdiction inquiry as always requiring proof of causation -- i.e., proof that the plaintiff's claim came about because of the defendant's in-state conduct. See also Bristol-Myers, 582 U. S., at 261-62 (quoting Goodyear [Dunlop Tires Operations, S.A. v. Brown], 564 U.S. [915] at 919 [(2011)] (asking whether there is 'an affiliation between the forum and the underlying controversy,' without demanding that the inquiry focus on cause)."

Id. at 362 (emphasis added). In other words, even if there is no direct causal link between the defendant's conduct in the forum state and the plaintiff's claims, the Supreme Court explained that jurisdiction may still exist so long as the claims are sufficiently "relate[d] to" the defendant's conduct in the forum state.

Although the evidence affirmatively showed that Ford had sold the subject vehicles in states other than the forum states, it also showed that Ford had engaged in extensive activities in the forum states related to those specific model vehicles. Id. at 357. Specifically, the Supreme Court noted that (1) Ford had sold more than 2,000 of the exact models and

years of the vehicles involved in the accidents at issue through dealerships in the forum states; (2) Ford had, "[b]y every means imaginable," urged residents of the forum states to buy its vehicles, including through billboard ads, TV and radio commercials, print ads, and direct mail; and (3) Ford had encouraged the forum states' citizens to become "lifelong Ford drivers" through its ongoing marketing of maintenance and repair services. Id. at 365.

The Court wrote that it "has stated that specific jurisdiction attaches in cases identical to the ones here -- when a company like Ford serves a market for a product in the forum State and the product malfunctions there." Id. at 363 (emphasis added). This is so, the Supreme Court explained, because, "when a corporation has 'continuously and deliberately exploited [a State's] market, it must reasonably anticipate being haled into [that State's] court[s]' to defend actions 'based on' products causing injury there." Id. at 364 (quoting Keeton, 465 U.S. at 781) (emphasis added).

Thus, despite Ford's not having sold the particular vehicles involved in the accidents in the forum states, the Supreme Court concluded that Ford had conducted business in those states by, "among

31

other things, <u>advertising, selling, and servicing the model of vehicle[s]</u> the suit[s] claim[] [are] defective," <u>id.</u> at 355 (emphasis added), and that those contacts were sufficient to create a "strong 'relationship among the defendant, the forum[s], and the litigation' -- the 'essential foundation' of specific jurisdiction," <u>id.</u> (citations omitted).

The Court emphasized that "Ford had systematically served a market" in the forum states "for the <u>very vehicles</u> that the plaintiffs allege[d] malfunctioned and <u>injured them in those States</u>." <u>Id.</u> at 365 (emphasis added). This was different, the Supreme Court noted, from <u>Bristol-Myers</u>, in which that Court had found jurisdiction to be improper because "the forum State, and the defendant's activities there, lacked any connection to the [nonresident] plaintiffs' claims." <u>Id.</u> at 369.

Because Ford had cultivated the market in the forum states and because those activities related to the plaintiffs' claims against it, the Supreme Court held that it was foreseeable for the courts in the forum states to exercise specific personal jurisdiction over Ford for injuries caused by those products in those states:

> "An automaker regularly marketing a vehicle in a State …
> has 'clear notice' that it will be subject to jurisdiction in the
> State's courts <u>when the product malfunctions there</u>
> (regardless where it is first sold). [World-Wide Volkswagen

Corp. v. Woodson,] 444 U.S. [286], at 297 [(1980)]. … Precisely because that exercise of jurisdiction is so <u>reasonable, it is also predictable</u> -- and thus allows Ford to 'structure [its] primary conduct' to lessen or even avoid the costs of state-court litigation. <u>World-Wide Volkswagen</u>, 44 U.S., at 297."

<u>Id.</u> at 368 (emphasis added).

Sawyer contends that the Supreme Court's reasoning and holding in <u>Ford</u> renders our plurality decision in <u>Hinrichs</u> "no longer good law" and that we should instead apply <u>Ford</u>'s analytical framework to the present case. Sawyer's brief at 37. With <u>Ford</u> now being the controlling law on this issue, we agree with Sawyer that we must apply that analytical framework to this case. In issuing <u>Ford</u>, the Supreme Court has now clarified that, even when there is no direct causal link between a plaintiff's claims and an out-of-state defendant's contacts with the forum state, specific personal jurisdiction may still attach if the defendant's contacts with the forum state "relate to" the plaintiff's cause of action. As it currently stands, our plurality decision in <u>Hinrichs</u> is inconsistent with <u>Ford</u> and is thus overruled. [9]

---

[9]Although we overrule <u>Hinrichs</u>, we do not intend to overrule, or even cast doubt on, the vast bulk of our personal-jurisdiction caselaw. Our personal-jurisdiction caselaw is generally consistent with <u>Ford</u>. For instance, as noted previously in this opinion, our Court has recently accurately summarized the degree of contacts that must exist for a trial

IV. Applying Ford to the Present Case

According to Sawyer, this case presents a straightforward application of Ford. She argues that Cooper Tire's contacts with Alabama "relate to" her cause of action because she alleged in her complaint that, before the accident, Cooper Tire had cultivated a market for the CS4 Touring tire in Alabama and that her claims are related to Cooper Tire's contacts with the State of Alabama because (1) Cooper Tire sold and distributed that tire-- the exact type of tire that caused the accident underlying her claims -- in Alabama through an authorized dealer network, (2) Cooper Tire extensively advertised and marketed that same model of tire in Alabama, and (3) the subject tire was purchased in Alabama, by an Alabama resident, and the accident occurred in Alabama. Sawyer also contends that the trial court's conclusion that Alabama has less of an interest in providing a forum for an out-of-state plaintiff's lawsuit against an out-of-state defendant is inconsistent with Ford, as well as other well-settled United States Supreme Court precedent,

---

court to exercise personal jurisdiction over an out-of-state defendant. See Pruitt v. AAA Interstate Transp., LLC, 358 So. 3d 1144, 1149-50 (Ala. 2022). See also Facebook, Inc. v. K.G.S., 294 So. 3d 122, 130 (Ala. 2019).

34

especially because the accident occurred in Alabama. Because Cooper Tire failed to offer any affidavit testimony refuting those jurisdictional allegations, Sawyer contends, the trial court's judgment is due to be reversed.

In response, Cooper Tire makes two principal arguments to distinguish <u>Ford</u> from the present case. First, it argues that it did not sell the CS4 Touring tire, including the subject tire, in Alabama during the "relevant timeframe" identified by the trial court and that this alone defeats Sawyer's personal-jurisdiction arguments. Second, it argues that, unlike the plaintiffs in <u>Ford</u>, Sawyer was not a resident of the forum state -- Alabama. Thus, Cooper Tire asserts that there is nothing showing that it had contacts with Alabama that "relate to" Sawyer's action.

<u>A. The Trial Court's Decision to Designate 2015-2018 as the "Relevant Timeframe" for its Personal Jurisdiction Analysis in this Case is Unsupported by the Record</u>

Before we apply the framework from <u>Ford</u> to the arguments being made here, we must first determine if the trial court was correct in finding that the "relevant timeframe" for analyzing Cooper Tire's contacts with Alabama was 2015-2018. Sawyer argues that that limitation is inconsistent with the Supreme Court's decision in <u>Ford</u>,

35

which emphasized that Ford had sold "thousands" of the subject cars in the forum states in the two decades leading up to the accidents at issue. She also argues that this narrow focus "makes particularly little sense" and runs the risk of creating odd results in cases similar to this one. Sawyer's brief at 33.

Cooper Tire contends, however, that Sawyer conceded to the designation of 2015-2018 as the relevant time frame for discovery in this case. For example, Cooper Tire notes that in one of her interrogatories, Sawyer asked: "'[H]ow many Cooper CS4 touring tires sized P235/65R17 were sold annually in Alabama for 2017, 2018 and 2019?'" Cooper Tire's brief at 39. Cooper Tire appears to contend that Sawyer's argument is, in essence, waived and that, like the trial court, we too should confine our personal-jurisdiction analysis to 2015-2018.

First, Cooper Tire does not provide this Court with citations to any relevant legal authority that hold that the time frame either before or after a manufacturer stops making a product should have any bearing on whether the manufacturer had sufficient contacts with a forum state. See Rule 28(b), Ala. R. App. P. (explaining that "[t]he brief of the appellee … shall conform to the requirements of subdivisions (a)(1)-(12)," including

the requirement under subdivision (a)(10) to provide "citations to the cases ... or other authorities ... relied on" in support of a legal proposition).

Likewise, we have been unable to locate any caselaw in this state or elsewhere that appears to stand for this proposition. In fact, as noted by Sawyer, the Supreme Court's decision in <u>Ford</u> includes facts that are just the opposite of such a rule. In that case, the models of the subject vehicles -- a 1996 Explorer and a 1994 Crown Victoria -- were manufactured <u>many years before</u> the underlying accidents occurred in 2015. In fact, it appears that Ford had even ceased manufacturing the Crown Victoria model before the accident occurred.[10] Had the <u>Ford</u> Court applied a time frame similar to the one advocated by Cooper Tire (and applied by the trial court), that decision almost certainly would have come out the other way. In any event, adopting such a rule would be illogical given that countless products, including car tires, often last years after they are manufactured and can sit on the shelves of

_____

[10]The accident involving the Crown Victoria at issue in Ford occurred in 2015. <u>See</u> <u>Bandemer v. Ford Motor Co.</u>, 931 N.W.2d 744, 748 (Minn. 2019). At the time of this decision, the following website indicated that Ford had ceased manufacturing the Crown Victoria in 2011: https://www.cars.com/research/ford-crown_victoria/

distributors for years.

Cooper Tire also does not explain why <u>only</u> this "timeframe" is "relevant" to the facts of the claims in this case. In any event, the facts indicate otherwise. It appears undisputed that Coggin purchased the subject tire in Alabama. It also appears undisputed that Cooper Tire manufactured the subject tire and sold this same model of tire in Alabama. Moreover, even if the subject tire had been sold in another state first -- or even if it had been previously used -- the vehicles in <u>Ford</u> were also sold first in another state and were previously used cars, but the Supreme Court still found that personal jurisdiction existed.

Moreover, Cooper Tire's assertion that Sawyer conceded to 2015-2018 as being the "relevant timeframe" for discovery in this case is not supported by the record. Although the record reflects that Sawyer did ask in one of her interrogatories the question identified by Cooper Tire, we note that only the allegations made in Sawyer's <u>complaint</u> are what are relevant to our personal-jurisdiction inquiry. The record shows that, in paragraph 112 of her complaint, Sawyer specifically alleged that "[p]rior to the date of the incident giving rise to this litigation, Cooper Tire had manufactured, sold, and distributed automobile tires into [the stream of]

commerce in the State of Alabama having the following specifications: a Cooper Tire tubeless radial bearing the name Cooper Tire CS4 Touring P235/65R17." (Emphasis added.) Nothing in the record before us indicates that the parties agreed that the trial court could designate 2015-2018 as the "relevant timeframe" for evaluating whether Cooper Tire had sufficient contacts with Alabama for the purpose of determining specific personal jurisdiction. The trial court's application of such a time frame is therefore unsupported by the record.

### B. Cooper Tire's Contacts with the State of Alabama "Relate to" Sawyer's Claims in this Action

Without any law or facts indicating that we must treat 2015-2018 as the "relevant timeframe" for jurisdictional purposes, we will examine the allegations in Sawyer's complaint and Cooper Tire's affidavits to determine if Sawyer's claims "relate to" Cooper Tire's contacts with the State of Alabama under the Supreme Court's framework in <u>Ford</u>.

As noted above, Sawyer's complaint broadly alleged that Cooper Tire had sold and distributed CS4 Touring tires in Alabama before the underlying accident and that it was the sale and distribution of the subject tire in Alabama that had caused her son's death. For instance, in paragraph 112 of her complaint, Sawyer alleged: "Prior to the date of the

39

incident … Cooper Tire had manufactured, sold, and distributed automobile tires into [the stream of] commerce in the State of Alabama having the following specifications: a Cooper Tire tubeless radial bearing the name Cooper Tire CS4 Touring P235/65R17." In paragraph 5 of her complaint, Sawyer specifically alleged: "Cooper Tire manufactured, assembled, marketed, warranted and placed in the stream of commerce the Cooper CS4 Touring tire P235/65R17 ('Subject Tire') which caused harm and injury to [Thomas] in the State of Alabama." Likewise, in paragraph 6 of her complaint, Sawyer alleged: "Cooper Tire sells its passenger and light truck tires, including the Subject Tire Model, to distributors and retailers throughout the State of Alabama." Finally, in paragraph 7 of her complaint, Sawyer alleged: "Cooper Tire maintains a tire dealer network comprised of approximately 324 Cooper Tire dealers across 117 cities throughout the State of Alabama."

As explained previously, when considering a motion to dismiss for lack of personal jurisdiction, a trial court must consider as true the allegations in the plaintiff's complaint that are "not controverted by the defendant's affidavits," and, "where the plaintiff's complaint and the defendant's affidavits conflict," the trial court "must construe all

40

reasonable inferences in favor of the plaintiff." <u>Pennsylvania Nat'l Mut. Cas. Ins. Co.</u>, 143 So. 3d at 787-88 (internal quotation marks and citations omitted).

Although Cooper Tire presented affidavit testimony from two of its employees -- Nicole K. Schwieterman and Craig Marks -- through which it refuted <u>some</u> of Sawyer's jurisdictional allegations, it has never offered any affidavit testimony disputing that it <u>at one time</u> sold or distributed the CS4 Touring tire in Alabama. For example, although Schwieterman and Marks dispute that Cooper Tire sold and distributed the CS4 Touring tire in Alabama <u>from 2015-2018</u>, they do not dispute that, as Sawyer alleges in her complaint, Cooper Tire sold and distributed that model tire in Alabama before the underlying accident, which would necessarily include the years <u>before 2015</u>.

Likewise, Cooper Tire never disputed -- even in its response brief in this appeal -- that it maintains an extensive tire-dealer network comprising of approximately 324 dealers across 117 cities throughout Alabama. In fact, in her affidavit, Schwieterman acknowledged that Cooper Tire's sales <u>in Alabama</u> are to independently owned businesses, including distributors, dealers, or tire-service facilities. That admission

41

bolsters Sawyer's allegations that Cooper Tire distributed the CS4 Touring tire in Alabama, as well as Coggin's statement in her affidavit that she purchased the subject tire in Alabama.

Without such affidavit testimony by Cooper Tire, the trial court was required to consider the unrefuted allegations in Sawyer's complaint concerning Cooper Tire's sale and distribution of the CS4 Touring tire in Alabama as true. Thus, the trial court's finding that there was no "evidence" that Cooper Tire had sold and distributed the CS4 Touring tire in Alabama incorrectly placed the burden for producing such evidence on Sawyer when, under our well-settled standard, that burden first rested on Cooper Tire.

But Sawyer alleged more than that Cooper Tire sold and distributed the CS4 Touring tire in Alabama and that it maintained an extensive authorized dealer network here. She also alleged that Cooper Tire conducted extensive marketing and advertising of the CS4 Touring tire in Alabama. In <u>Ford</u>, the Supreme Court concluded that Ford's extensive marketing and advertising in the forum states of the same kind of product at issue in the plaintiffs' actions showed that Ford "'continuously and deliberately exploited [a State's] market'" to such an

42

extent that "'it must reasonably anticipate being haled into [that State's] court[s]' to defend actions 'based on' products causing injury [there]." Ford, 592 U.S. at 364 (quoting Keeton, 465 U.S. at 781). Relying upon that holding in Ford, Sawyer contends that Cooper Tire's undisputed marketing and advertising of the CS4 Touring tire in Alabama supports a similar finding of specific personal jurisdiction in this case.

In its brief, Cooper Tire does not dispute that it has offered no affidavit testimony refuting Sawyer's allegations that it marketed and advertised its products, including the CS4 Touring tire, in Alabama. Rather, it contends that Sawyer's assertions, if accepted by this Court, would "fashion a new rule that subjects an out-of-state defendant to personal jurisdiction based upon nothing other than the fact that the defendant has advertised in the forum even when that advertising is not related to the dispute." Cooper Tire's brief at 31. Cooper Tire therefore contends that we should not hold that Sawyer's advertising allegations establish that her claims "relate to" Cooper Tire's contacts with Alabama.

Cooper Tire is mistaken that its marketing of the CS4 Touring tire, along with its past sales of that product, cannot establish specific personal jurisdiction. In Ford, the Supreme Court wrote:

43

"To see why Ford is subject to jurisdiction in these cases …, consider first the business that the company regularly conducts in Montana and Minnesota. See generally [Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.,] 395 Mont. [478] at 488, 443 P.3d [407] at 414 [(2019)]; [Bandemer v. Ford Motor Co.,] 931 N.W.2d [744] at 748 [(Minn. 2019)]; supra, at 1023 - 1024. Small wonder that Ford has here conceded 'purposeful availment' of the two States' markets. See supra, at 1025 - 1026. By every means imaginable -- among them, billboards, TV and radio spots, print ads, and direct mail -- Ford urges Montanans and Minnesotans to buy its vehicles, including (at all relevant times) Explorers and Crown Victorias. Ford cars -- again including those two models -- are available for sale, whether new or used, throughout the States, at 36 dealerships in Montana and 84 in Minnesota. And apart from sales, Ford works hard to foster ongoing connections to its cars' owners. The company's dealers in Montana and Minnesota (as elsewhere) regularly maintain and repair Ford cars, including those whose warranties have long since expired. And the company distributes replacement parts both to its own dealers and to independent auto shops in the two States. Those activities, too, make Ford money. And by making it easier to own a Ford, they encourage Montanans and Minnesotans to become lifelong Ford drivers.

"Now turn to how all this Montana- and Minnesota-based conduct relates to the claims in these cases, brought by state residents in Montana's and Minnesota's courts. Each plaintiff's suit, of course, arises from a car accident in one of those States. In each complaint, the resident-plaintiff alleges that a defective Ford vehicle -- an Explorer in one, a Crown Victoria in the other -- caused the crash and resulting harm. And as just described, Ford had advertised, sold, and serviced those two car models in both States for many years. … In other words, Ford had systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States."

44

592 U.S. at 364-65. Because Ford had systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs alleged had malfunctioned and injured them in those States, the Supreme Court held that there was a strong "'relationship among the defendant, the forum, and the litigation'" -- the "'essential foundation'" of specific jurisdiction. Id. at 365 (citation omitted). The Supreme Court concluded that this served as a legitimate basis upon which the forum states could exercise specific personal jurisdiction over Ford. Id. at 366-68.

Like in Ford, in her complaint, Sawyer specifically alleged that Cooper Tire "conducted extensive advertising and marketing campaigns for its passenger and light truck tires, including the Subject Tire model, that reached consumers in the State of Alabama and connected Alabama consumers with the closest Cooper Tire dealer." (Emphasis added.) She also alleged:

> "13. Cooper Tire's advertising also includes Cooper Tire sponsorship for the Southeastern Conference (SEC) Basketball tournament for the University of Alabama collegiate basketball program; Cooper Tire sponsorship for the 'Cooper Tire Performer of the Week' for the University of Alabama collegiate sports program; Cooper Tire sponsorship for an Alabama football blog; Cooper Tire sponsorship of the Bassmaster Elite Series, which is headquartered in the State of Alabama; and Cooper Tire sponsorship for the Paul

45

Finebaum sports talk show, which broadcasts in the State of Alabama. …"

As explained previously in this opinion, when considering a motion to dismiss for lack of personal jurisdiction, a trial court must consider as true the allegations in the plaintiff's complaint that are "not controverted by the defendant's affidavits." Pennsylvania Nat'l Mut. Cas. Ins. Co., 143 So. 3d at 787 (internal quotation marks and citations omitted). Taken together, under the Supreme Court's decision in Ford, Sawyer's unrefuted allegations that Cooper Tire (1) sold and distributed the CS4 Touring tire, including the subject tire, in Alabama, (2) maintained an extensive dealer network in Alabama, and (3) marketed this tire model in Alabama all support a finding that her claims "relate to" Cooper Tire's contacts with Alabama.[11]

V. The Trial Court's Conclusion that Sawyer's Florida Residency Prevents the Exercise of Specific Personal Jurisdiction in this Case

---

[11]In reaching our conclusion here, we need not reach the outer limits of the stream-of-commerce test, and nothing in this opinion should be construed as doing so. As the Supreme Court recognized in Ford, the conclusion that specific personal jurisdiction exists in cases with these types of facts "does not mean anything goes. In the sphere of specific jurisdiction, the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum." 592 U.S. at 362. Although there will be cases in which the facts may require this Court to address the outer limits of the stream-of-commerce test, this is not such a case.

is Mistaken

Cooper Tire alternatively argues, however, that the trial court correctly concluded that it should not exercise specific personal jurisdiction over it because, unlike the plaintiffs in <u>Ford</u> who were residents of the forum states, neither Sawyer nor her son were Alabama residents. According to Cooper Tire, "Alabama's interest in providing Florida residents a place to litigate is minimal." Cooper Tire's brief at 28.

In making this argument, Cooper Tire, like the trial court, relies heavily on a post-<u>Ford</u> product-liability case from an Alabama federal court -- <u>Tyler v. Ford Motor Co.</u> (Case No. 2:20-CV-584-WKW, Nov. 17, 2021) (M.D. Ala. 2021) (not reported in Federal Supplement) (judgment vacated). In <u>Tyler</u>, a Florida resident brought claims against Ford for her injuries, and for the death of her husband, which had been caused by an accident that had occurred in Alabama while driving a Ford F-250 pickup truck. Ford moved to dismiss the plaintiff's suit against it on the basis that the district court could not exercise specific personal jurisdiction over it because (1) the plaintiff was a resident of Florida and (2) the pickup truck had not been designed, manufactured, or sold to the plaintiff in Alabama.

47

In evaluating Ford's arguments, the district court summarized its understanding of the holding in <u>Ford</u> by stating "that personal jurisdiction exists where '<u>resident-plaintiffs</u> allege that they suffered in-state injury because of defective products <u>that Ford extensively promoted, sold, and serviced in [the forum state]</u>.'" (Quoting <u>Ford</u>, 592 U.S. at 371) (emphasis added). Applying that reading of <u>Ford</u> to the facts of the case before it, the district court explained:

> "There is no question that Ford has purposefully availed itself of the privilege of conducting business in Alabama. Ford purposefully reaches out to Alabama in a number of different ways -- supplying vehicles to dealerships in Alabama, advertising in Alabama, maintaining a resale market in Alabama, shipping replacement parts to Alabama, and so on. Ford admits that its contacts with Alabama are at least as extensive as its contacts with the forum states in <u>Ford Motor [Co. v. Montana Eighth Judicial District Court</u>, 592 U.S. 351 (2021)]."

Despite Ford "purposefully avail[ing]" itself of "the privilege of conducting business in Alabama," the district court in <u>Tyler</u> concluded that Ford's "contacts with Alabama have nothing to do with the complained-of vehicle, and [the] Plaintiff has not drawn any connection between Ford's contacts and the events-at-suit." It explained that any actions <u>by the plaintiff</u> in bringing the vehicle at issue to Alabama were insufficient to support the exercise of personal jurisdiction over Ford:

48

"It is well-settled that the actions of a plaintiff or third party cannot alone constitute a basis for personal jurisdiction over a defendant. See Walden v. Fiore, 571 U.S. 277, 286 (2014). The minimum contacts analysis must focus on the defendant's actions in the forum state. Id. Thus, the fact that the Tylers drove their F-250 into Alabama cannot establish personal jurisdiction over Ford. The fact that Defendant Lane side-swiped the Tylers in Alabama also cannot establish personal jurisdiction over Ford. Indeed, none of the events with the particular F-250 at issue can be fairly characterized as contacts that Ford made with Alabama. The only contacts that Ford made with Alabama -- and thus the only contacts upon which personal jurisdiction can be based -- are the other marketing, servicing, repair, and sales contacts that Ford regularly performs in Alabama."

(Some emphasis in original; some emphasis added.)

In reaching its conclusion, the district court noted that the Supreme Court has been concerned about expanding specific personal jurisdiction so far that it would open the door for plaintiffs to sue a corporate defendant in every state across the country. Specifically, the district court explained that the Supreme Court in Ford had

"cringed at the idea of plaintiffs being able to sue in all fifty states for a local controversy. [Ford, 592 U.S.] at [362] n.3. This kind of unlimited jurisdiction has long been the bogeyman of the Supreme Court's personal jurisdiction jurisprudence. See Hanson [v. Denckla], 357 U.S. [235,] 251 [(1958)] ('But it is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts.'). Yet, if Ford's contacts with Alabama -- related to this case solely because similar products are being marketed, sold, and repaired -- are sufficient to

49

support personal jurisdiction, then there is essentially no limit on personal jurisdiction against Ford. Ford maintains such a market in every state, as do nearly all motor vehicle manufacturers. <u>Personal jurisdiction would become irrelevant in suits against nationwide companies</u>."

(Emphasis added.)

The district court in <u>Tyler</u> opined that the Supreme Court in <u>Ford</u> had deemed the plaintiffs' residency to be especially relevant in determining the relatedness of the defendant's contacts with the plaintiffs' suits:

> "<u>Additionally, the Supreme Court in </u>Ford Motor<u> went to great lengths to explain how Ford's contacts with the forum states in those cases were relevant to the</u> resident-plaintiffs' <u>claims</u>. [592 U.S. at 364-67]. The Court discussed at length the possibility of causation for resident-plaintiffs. <u>Id.</u> <u>Further, the Court specifically mentioned the residency of the plaintiffs at least twenty times in the opinion</u>. <u>Id.</u> If residency were irrelevant, much of the Court's analysis would be irrelevant. The Court's holding -- that '<u>resident-plaintiffs</u> [who] allege that they suffered in-state injury because of defective products that Ford extensively promoted, sold, and serviced in Montana and Minnesota' can invoke the jurisdiction of their home states, <u>id.</u> at [371] (emphasis added) -- would be too narrow, as it would be unnecessary to qualify the holding by mentioning the residency of the plaintiff."

(Some emphasis in original; some emphasis added.) Based on the foregoing, because the plaintiff in <u>Tyler</u>, a Florida resident, had not drawn any connection "between Ford's contacts and the events-at-suit,"

the district court concluded that it could not exercise specific personal jurisdiction over Ford.

Echoing the district court's analysis in <u>Tyler,</u> Cooper Tire contends that the <u>Ford</u> Court "plainly held that 'related to' jurisdiction includes an assessment of the plaintiff's residency." Cooper Tire's brief at 30. Specifically, Cooper Tire asserts:

> "The fact that the accident took place in Alabama is not enough to allow for the constitutional exercise of personal jurisdiction over Cooper Tire. The critical factor is the purposeful suit-related contact the defendant has with the forum. The plaintiff's residency 'still may be relevant in assessing the link between the defendant's forum contacts and the plaintiff's suit ….' [<u>Ford</u>, 592 U.S. at 369].
>
> "In this instance, Cooper Tire did not send into Alabama <u>any</u> of the approximately 5,000 CS4 Touring size [P]235/65R17 tires it distributed from 2015 through 2018. … <u>Thus, Alabama has no interest in exerting personal jurisdiction over an out-of-state defendant with no suit-related contacts</u>. In other words, Alabama has no interest in providing a forum for an out-of-state plaintiff."

Cooper Tire's brief at 30 (final emphasis added).

Cooper Tire is misreading <u>Tyler</u>. Such an argument about the <u>plaintiff's residency</u> conflicts with decades-old precedent from the Supreme Court that has upheld jurisdiction over an out-of-state defendant even when contacts between the plaintiff and the forum state

51

are entirely lacking. Those cases have done so because it is the defendant's contacts with the forum state -- not the plaintiff's contacts -- that are most relevant to determining whether there are sufficient contacts with the forum state. See Keeton, 465 U.S. at 780 (stating that the "plaintiff's residence in the forum State is not a separate requirement, and lack of residence [by the plaintiff] will not defeat jurisdiction established on the basis of [the] defendant's contacts" (emphasis added)). In fact, Tyler itself states: "The minimum contacts analysis must focus on the defendant's actions in the forum state." (Emphasis altered.)

Although the Supreme Court in Ford mentioned the plaintiffs' residencies, it did so for reasons other than creating a new, independent requirement for specific personal jurisdiction. This included refuting Ford's contention that the states of first-sale, design, or manufacture -- all states that had no connection to either the plaintiffs or the injuries -- were the more proper forums. Ford, 592 U.S. at 361, 368.

The Supreme Court also mentioned residency to demonstrate that the courts in Montana and Minnesota had an interest in providing people injured within their borders with a convenient forum to enforce their own

safety regulations. Like those states, Alabama has a strong sovereign interest in providing a forum to people who are injured on its roads and in enforcing its own safety regulations within its borders. This is particularly relevant here, where the owner of the subject tire was an Alabama resident who had purchased the tire in Alabama.

Moreover, to the extent that the plaintiff's residency has any relevancy, Tyler is distinguishable from the present case. In that case, the vehicle at issue had been manufactured in Mexico, sold to an independent dealer in Tennessee, and purchased by the plaintiff in Florida. Here, however, as established previously in this opinion, Cooper Tire has not offered any affidavit evidence refuting that the CS4 Touring tire -- including the subject tire -- was sold, distributed, and marketed in Alabama. Even more to the point, unlike Tyler, the purchaser here was an Alabama resident who had made the purchase in Alabama. It is therefore reasonable for this Court to conclude that Alabama has a much stronger interest in this lawsuit as compared to the lawsuit in Tyler.

Under Ford and the facts of this case, the fact that Sawyer and her son were not Alabama residents is not determinative because Cooper Tire's contacts with Alabama are sufficient for the exercise of specific

personal jurisdiction in this case.[12] Thus, for the reasons previously stated, we hold that the trial court erred in determining that it could not exercise specific personal jurisdiction over Cooper Tire in this case.

Conclusion

For all the reasons explained above, under the Supreme Court's analytical framework in Ford, the connection between Sawyer's claims and Cooper Tire's unrefuted sale, distribution, and marketing of the CS4 Touring tire in Alabama is sufficient to support the exercise of specific personal jurisdiction over Cooper Tire in this case. We therefore reverse the trial court's judgment dismissing Sawyer's claims against Cooper

---

[12]Because the facts in this case establish the existence of sufficient contacts between Cooper Tire and Alabama, we need not decide whether the district court's emphasis on the plaintiff's residency in Tyler was mistaken under the facts in that case. Compare Chavez v. Bridgestone Americas Tire Operations, LLC, 527 P.3d 652 (N.M.Ct.App. 2022) (holding that the fact that resident motorist's fatal accident occurred out of state in Texas rather than in New Mexico did not preclude the determination that tire manufacturer had sufficient minimum contacts with New Mexico for one of that state's courts to exercise specific personal jurisdiction over the tire manufacturer); and Martins v. Bridgestone Americas Tire Operations, LLC, 266 A.3d 753 (R.I. 2022) (holding that claims brought by resident driver's estate against manufacturers and designers of allegedly defective tires on truck that driver was operating out of state, which allegedly caused his death, did not arise out of or relate to manufacturers' and designers' contacts with Rhode Island and, thus, that specific personal jurisdiction could not be established).

Tire and remand the case for proceedings consistent with this opinion.[13]

REVERSED AND REMANDED.

Shaw, Wise, Bryan,* Mendheim, and Stewart, JJ., concur.

Mitchell, J., concurs specially, with opinion, which Parker, C.J., joins.

Cook, J., concurs specially, with opinion.

Sellers, J., dissents, with opinion.

---

[13]Because this issue is dispositive in this case, we pretermit discussion of the remaining issues raised on appeal. See Johnson v. Ellis, 308 So. 3d 1, 3 n.3 (Ala. 2020) (citing Favorite Market Store v. Waldrop, 924 So. 2d 719, 723 (Ala. Civ. App. 2005) (stating that this Court would pretermit discussion of further issues in light of the dispositive nature of another issue)).

*Although Justice Bryan did not attend oral argument in this case, he has viewed a video recording of that oral argument.

MITCHELL, Justice (concurring specially).

I concur fully with the majority opinion. I write separately to encourage parties in future personal-jurisdiction cases to analyze the original public meaning of Alabama's Due Process Clause, rather than rely solely on the Fourteenth Amendment's Due Process Clause.

Rule 4.2(b) of the Alabama Rules of Civil Procedure allows Alabama courts to exercise personal jurisdiction over out-of-state defendants when it "is not inconsistent with the <u>constitution of this state</u> or the Constitution of the United States" to do so. (Emphasis added.) But past cases from this Court have deemphasized the role of the State Constitution in this inquiry.

The majority opinion correctly points out that our Court "has interpreted the due process guaranteed under the Alabama Constitution to be coextensive with the due process guaranteed under the United States Constitution" in the personal-jurisdiction context. <u>Elliott v. Van Kleef</u>, 830 So. 2d 726, 730 (Ala. 2002); <u>see also</u> <u>Pruitt v. AAA Interstate Transp., LLC</u>, 358 So. 3d 1144, 1148 (Ala. 2022). As a result, our Court has relied heavily on federal caselaw in personal-jurisdiction cases. <u>See, e.g.</u>, <u>Pruitt</u>, 358 So. 3d at 1148-49 (relying heavily on federal caselaw);

Hinrichs v. General Motors of Canada, Ltd., 222 So. 3d 1114, 1123-41 (Ala. 2016) (plurality opinion) (same); Elliott, 830 So. 2d at 730-32 (same); Alabama Waterproofing Co. v. Hanby, 431 So. 2d 141, 146 (Ala. 1983) (same); DeSotacho, Inc. v. Valnit Indus., Inc., 350 So. 2d 447, 449-50 (Ala. 1977) (same).

Our Court, in other words, seems to be engaged in "lockstepping" -- tethering the interpretation of Alabama's Constitution to the Supreme Court's interpretation of the federal Constitution. See Jeffrey S. Sutton, 51 Imperfect Solutions: States and the Making of American Constitutional Law 174 (2018). That practice is questionable. As Georgia Supreme Court Justice Nels Peterson has observed, "it is difficult to square lockstepping with a focus on original public meaning." Nels S.D. Peterson, Principles of Georgia Constitutional Interpretation, 75 Mercer L. Rev. 1, 21 (2023). By interpreting the Alabama and federal due-process guarantees as coextensive, we have signed our State up to follow the ebbs and flows of a federal court's interpretation of a federal constitutional provision, regardless of whether that practice reflects the original public meaning of our State's Constitution. Without more evidence about the original public meaning of the Alabama Constitution,

the practice of lockstepping makes little sense.

The problems associated with lockstepping are magnified in instances in which the text of the State constitutional provision differs substantially from that of the federal constitutional provision. Here, Alabama's Due Process Clause and the Fourteenth Amendment's Due Process Clause have little in common except for the phrase "due process of law." Compare Ala. Const. 2022, art. I, § 13 ("[E]very person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law; and right and justice shall be administered without sale, denial, or delay.") with U.S. Const. amend. 14, § 1 ("No State shall … deprive any person of life, liberty, or property, without due process of law.").[14] It would be unusual for two provisions that are worded so differently to have an identical meaning and application in all cases.

In an appropriate case, I believe this Court should consider what protections the Alabama Constitution provides independent of the

---

[14]For a useful tool to compare state and federal constitutional provisions, see Am. Juris Link State Const. Tool, which, at the time of this decision, could be located at: https://stateconstitutiontool.org.

Fourteenth Amendment. To do so, we need parties to brief and argue the original public meaning of Section 13 of the Alabama Constitution -- and any other constitutional provision that may be relevant. See Barnett v. Jones, 338 So. 3d 757, 768-69 (Ala. 2021) (Mitchell, J., concurring specially) (encouraging "parties and amici curiae in future state-constitutional cases to provide appropriate research and arguments about the original public meaning" of State constitutional provisions).

Neither party to this appeal has questioned our Court's practice of lockstepping with federal courts in personal-jurisdiction cases. As a result, I agree with the majority opinion that, under the United States Supreme Court's current personal-jurisdiction precedent, Cooper Tire & Rubber Company has sufficient contacts with Alabama to support specific personal jurisdiction. See Ex parte McKinney, 87 So. 3d 502, 509 n.7 (Ala. 2011) (noting this Court's "disinclination to overrule existing caselaw in the absence of either a specific request to do so or an adequate argument asking that we do"). But with the assistance of proper original-public-meaning briefing, I would be willing to reconsider our Court's lockstepping of the Alabama Constitution's and the Fourteenth Amendment's due-process guarantees in the personal-jurisdiction

context.

Parker, C.J., concurs.

COOK, Justice (concurring specially).

In my view, the main opinion presents a relatively straightforward application of the "relate to" test for specific personal jurisdiction as discussed in <u>Ford Motor Co. v. Montana Eighth Judicial District Court</u>, 592 U.S. 351 (2021). Unfortunately, application of that test will not always be so straightforward in future cases with more complex fact patterns. Although I am the author of the main opinion, I write separately to provide some suggestions to the bench and bar in such future cases. To be clear, this is a test of the United States Supreme Court and I am bound by it. Further, I speak only for myself in this writing. Thus, I write as a fellow traveler attempting to explain the map -- rather than as a mapmaker.

In his concurrence in the judgment in <u>Ford</u>, Justice Neil Gorsuch, joined by Justice Clarence Thomas, recognized the ambiguity created by the majority's decision to treat a defendant's contacts with a forum state that "relate to" the plaintiff's claims as an "independent" basis of specific personal jurisdiction, writing: "<u>Where this leaves us is far from clear</u>." 592 U.S. at 376 (emphasis added). He noted that, although "the majority says[] it is enough if an 'affiliation' or 'relationship' or 'connection' exists

between" a defendant's in-state conduct and a plaintiff's injuries, it is unclear "what … this assortment of nouns mean[s]" and that, "[l]oosed from any causation standard, we are left to guess." Id. (emphasis altered). Although Justice Gorsuch acknowledged that "[t]he majority promises that its new test 'does not mean anything goes,'" he remained concerned that this "hardly tells us what does." Id.; see generally Anthony Petrosino, Rationalizing Relatedness: Understanding Personal Jurisdiction's Relatedness Prong in the Wake of Bristol-Myers Squibb and Ford Motor Co., 91 Fordham L. Rev. 1563 (2023).

Perhaps some of this ambiguity created by the "relate to" test is simply inherent in any personal-jurisdiction test given that a trial court's authority to exercise personal jurisdiction over an out-of-state defendant must be consistent with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. See Ford, 592 U.S. at 358 (recognizing the key role of the Due Process Clause). The question of specific personal jurisdiction "depends on the defendant's having such 'contacts' with the forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" Id.

(quoting <u>International Shoe Co. v. Washington</u>, 326 U.S. 310, 316-17 (1945). In other words, establishing brightline tests for personal jurisdiction may be extremely difficult given that it must cover such a wide variety of cases and fact patterns while also taking into account due-process principles.

Despite this need for flexibility, I sympathize with Justice Gorsuch's frustration with the "relate to" test. I am certain that judges across our state and country will feel that same frustration as they attempt to apply the Supreme Court's new analytical framework for the "relate to" test in <u>Ford</u> to the dizzying permutation of facts that future lawsuits will inevitably present.[15] Having reflected upon the <u>Ford</u> opinion, I believe that there are two metrics that the Supreme Court implicitly introduced in that case that can help the bench and bar as we seek to apply <u>Ford</u>'s new analytical framework for the "relate to" test. As explained below, because these metrics are consistent with the values that drive the Supreme Court's specific-personal-jurisdiction precedent,

---

[15]<u>See, e.g.</u>, <u>Schrier v. Qatar Islamic Bank</u>, 632 F. Supp. 3d 1335, 1359 n.17 (S.D. Fla. 2022) (discussing <u>Ford</u> and noting that, "[u]nfortunately, while we now know what the standard <u>isn't</u> (but-for causation), it's a little unclear what the right standard <u>is</u>").

I believe that they are the logical tools that can be used when applying Ford's "relate to" test in cases with more complex fact patterns.

### I. The Values Driving Specific Personal Jurisdiction in Ford -- Fairness and Federalism

In Ford, the Supreme Court explained that, to establish specific personal jurisdiction, a trial court should first ask if (1) the defendant "'purposefully avail[ed] itself of the privilege of conducting activities within the forum State'" -- for instance, by cultivating a market -- and (2) "[t]he plaintiff's claims ... '... arise out of ... the defendant's contacts' with the forum" or "[t]he plaintiff's claims ... "... relate to the defendant's contacts' with the forum." Ford, 592 U.S. at 359 (citation omitted; emphasis added). Each of those factors bears on whether the defendant could "reasonably anticipate being haled into court" in the forum state in connection with the claims brought by the plaintiff. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

The Supreme Court then noted that "[t]hese rules derive from and reflect two sets of values -- treating defendants fairly and protecting 'interstate federalism.'" Id. at 360 (quoting World-Wide Volkswagen Corp., 444 U.S. at 293) (emphasis added). In Ford, the Supreme Court noted that, when evaluating personal jurisdiction in the past, it has

"appl[ied] the standards set out in <u>International Shoe</u> and its progeny,

with attention to their <u>underlying values of ensuring fairness and

protecting interstate federalism.</u>" <u>Id.</u> at 360 n.2 (emphasis added).[16]

In <u>Ford</u>, both the fairness and the federalism interests were easily

---

[16]Likewise, <u>Ford</u> explained that

"<u>[o]ne State's 'sovereign power to try' a suit, we have
recognized, may prevent 'sister States' from exercising their
like authority</u>. [<u>Worldwide Volkswagen</u>, 444 U.S.] at 293. <u>The
law of specific jurisdiction thus seeks to ensure that States
with 'little legitimate interest' in a suit do not encroach on
States more affected by the controversy</u>. <u>Bristol-Myers
[Squibb Co. v. Superior Court of Cal., San Francisco Cnty.]</u>,
582 U.S. [255], at [263] [(2017)]."

592 U.S. at 360 (emphasis added).  Some on the Court have gone further
in their emphasis on federalism.  For example in <u>J. McIntyre Machinery,
Ltd. v. Nicastro</u>, 564 U.S. 873 (2011), a plurality of the Court described
jurisdiction as a matter of state authority (thus respecting federalism).
564 U.S. at 883 (recognizing that "<u>jurisdiction is in the first instance a
question of authority rather than fairness</u>" (emphasis added)).  And in
<u>Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco
County</u>, 582 U.S. 255 (2017), the Court explained restrictions on
jurisdiction as a result of "'territorial limitations'" on state power. 582
U.S. at 263 (quoting <u>Hanson v. Denckla</u>, 357 U.S. 235, 251 (1958)).
Despite the clear statements from the Supreme Court emphasizing
federalism, some commentators have criticized the consideration of
federalism.  <u>See generally</u> Robert M. Bloom & Janine A. Hanrahan, <u>Back
to the Future: The Revival of Pennoyer in Personal Jurisdiction Doctrine
and the Demise of</u> International Shoe, 56 San Diego L. Rev. 581 (2019)
(criticizing this consideration of authority and federalism and instead
emphasizing fairness).

satisfied under the "relate to" test. The forum states had a strong and legitimate interest in adjudicating the disputes because (among other reasons) (1) the plaintiffs "used the allegedly defective products in the forum States," (2) the plaintiffs "suffered injuries when those products malfunctioned in the forum States," and (3) Ford was selling and advertising the very same model products in the forum states. Id. at 370. It was not surprising that a state would have the power to exercise specific personal jurisdiction over a corporation in such circumstances.[17] Thus, the exercise of specific personal jurisdiction over Ford was both fair and protected interstate federalism. As Justice Alito stated very succinctly in his concurrence in the judgment in Ford:

> "Ford has long had a heavy presence in Minnesota and Montana. It spends billions on national advertising. It has many franchises in both States. Ford dealers in Minnesota and Montana sell and service Ford vehicles, and Ford ships replacement parts to both States. In entertaining these suits, Minnesota and Montana courts have not reached out and grabbed suits in which they 'have little legitimate interest.' Bristol Myers Squibb Co. v. Superior Court of Cal., San

---

[17]As some commentators have written: "Indeed, what is most remarkable about Ford is that, seventy-five years after International Shoe Co. v. Washington and forty years after World-Wide Volkswagen, Ford could argue with a straight face that specific jurisdiction was lacking." Maggie Gardner, Pamela K. Bookman, Andrew D. Bradt, Zachary D. Clopton & D. Theodore Rave, The False Promise of General Jurisdiction, 73 Ala. L. Rev. 455, 456-57 (2022).

Francisco Cty., 582 U. S. 255, 263 (2017). <u>Their</u> residents, while riding in vehicles purchased within <u>their</u> borders, were killed or injured in accidents on <u>their</u> roads. <u>Can anyone seriously argue that requiring Ford to litigate these cases in Minnesota and Montana would be fundamentally unfair</u>?"

<u>Id.</u> at 372 (final emphasis added).

## II. The Two Metrics

These two values -- fairness and federalism -- help explain two metrics that I believe can be distilled from the <u>Ford</u> opinion.

### A. "The Most Natural State" Metric

In <u>Ford</u>, the Supreme Court explained that each of the plaintiffs had brought suit in "<u>the most natural State.</u>" 592 U.S. at 370 (emphasis added). As a result, the exercise of specific personal jurisdiction over Ford by Minnesota and Montana easily satisfied the values of fairness and interstate federalism. For example, federalism was satisfied because Minnesota and Montana were not "reach[ing] out and grabb[ing] suits in which they 'have little legitimate interest.'" <u>Id.</u> at 372 (Alito, J., concurring in the judgment). Likewise, fairness was satisfied because nobody should have been surprised by the exercise of jurisdiction. By virtue of cultivating a market in those states, Ford should have "reasonably anticipate[d] being haled into court" in those states for such

67

claims. <u>Keeton v. Hustler Magazine, Inc.</u>, 465 U.S. 770, 781 (1984).

Comparing <u>Ford</u> to <u>Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County</u>, 582 U.S. 255 (2017) -- a case on which Ford relied in arguing against the exercise of specific personal jurisdiction -- underscores this point. In <u>Bristol-Myers</u>, the plaintiffs did not purchase the product in the forum state, did not use the product in the forum state, and were not even residents of the forum state. In fact, there was no affiliation between the forum state and the underlying controversy because no activity relevant to the claims of the nonresidents took place in that forum and the forum did not have an interest in the outcome of the plaintiffs' litigation. As a result, California clearly was not "the most natural State" for the plaintiffs to bring their claims. Allowing California to exercise specific personal jurisdiction in such a case would have been contrary to federalism and would have improperly allowed California to infringe on the authority of the other states that should have had authority to adjudicate such claims. [18]

---

[18]It is thus not surprising that some commentators have referred to the lawsuit in <u>Bristol-Myers</u> as an example of forum shopping. <u>See, e.g.,</u> Anthony Petrosino, <u>Rationalizing Relatedness: Understanding Personal Jurisdiction's Relatedness Prong in the Wake of</u> Bristol-Myers Squibb <u>and</u> Ford Motor Co., 91 Fordham L. Rev. 1563, 1590-91 (2023).

However, the language in Ford about "the most natural State" does not mean that there will be only one forum where specific personal jurisdiction can apply.[19] Thus, it is possible that more than one forum state could have specific personal jurisdiction over an out-of-state defendant.

Given that there are so many possible permutations of facts, this metric may not help resolve every case.[20] Nevertheless, I believe that this

---

[19]Nor does such language imply that there always must be at least one forum state where specific personal jurisdiction exists. In fact, although unlikely, it might be possible that no state would have specific personal jurisdiction.

[20]Some of the many possible permutations that these metrics might (or might not) reach include: (1) cases against manufacturers of component parts for other products, see Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty., 480 U.S. 102 (1987); (2) cases involving electronic commerce or electronic communication, see Gregory C. Cook & Andrew Ross D'Entremont, No End in Sight?: Navigating the "Vast Terrain" of Personal Jurisdiction in Social Media Cases After Ford, 73 Ala. L. Rev. 621 (2022); (3) cases involving intentional torts, especially those other than defamation, see Ex parte M.E.J., [Ms. SC-2023-0062, Oct. 13, 2023] ____ So. 3d ____ (Ala. 2023); and (4) cases involving closely related models of a product, but not the exact same model (for instance, a sport-utility vehicle and a truck based upon the same vehicle frame), see Yamashita v. LG Chem, Ltd., 62 F.4th 496, 506-07 (9th Cir. 2023) (noting that Ford found specific jurisdiction "because Ford sold the relevant models to consumers in the forum states" and concluding that the batteries that LG sold in the forum state (Hawaii) were "as different as sedans and 18-wheelers" from the batteries at issue in the lawsuit and therefore finding no personal jurisdiction).

is a helpful metric in a specific-personal-jurisdiction analysis because, if the forum state is "<u>the</u> most natural State" (emphasis added), it will be, in my humble view, very likely that both fairness and interstate federalism will support the exercise of specific personal jurisdiction by that state. I believe, therefore, that "the most natural State" metric can be a useful way of overcoming the perceived ambiguity created by the Supreme Court's new analytical framework for the "relate to" test provided in <u>Ford</u>.

## B. The "Constructive Causation" Metric

In addition to "the most natural State" metric, the Supreme Court in <u>Ford</u> also appeared to examine whether causation was <u>theoretically possible</u> even if "but for" causation has not been demonstrated in the facts:

> "Small wonder that Ford has here conceded 'purposeful availment' of the two States' markets. … By every means imaginable -- among them, billboards, TV and radio spots, print ads, and direct mail -- Ford urges Montanans and Minnesotans to buy its vehicles, including (at all relevant times) Explorers and Crown Victorias. Ford cars -- again including those two models -- are available for sale, whether new or used, throughout the States, at 36 dealerships in Montana and 84 in Minnesota. And apart from sales, Ford works hard to foster ongoing connections to its cars' owners. The company's dealers in Montana and Minnesota (as elsewhere) regularly maintain and repair Ford cars, including

70

those whose warranties have long since expired. And the company distributes replacement parts both to its own dealers and to independent auto shops in the two States. Those activities, too, make Ford money. And by making it easier to own a Ford, they encourage Montanans and Minnesotans to become lifelong Ford drivers.

"Now turn to how all this Montana- and Minnesota-based conduct relates to the claims in these cases, brought by state residents in Montana's and Minnesota's courts. Each plaintiff's suit, of course, arises from a car accident in one of those States. In each complaint, the resident-plaintiff alleges that a defective Ford vehicle -- an Explorer in one, a Crown Victoria in the other -- caused the crash and resulting harm. And as just described, Ford had advertised, sold, and serviced those two car models in both States for many years. (Contrast a case, which we do not address, in which Ford marketed the models in only a different State or region.) In other words, Ford had systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States. So there is a strong 'relationship among the defendant, the forum, and the litigation' -- the 'essential foundation' of specific jurisdiction. Helicopteros[ Nacionales de Colombia, S.A. v. Hall], 466 U.S. [408], at 414 [(1984)] ….

"….

"… For the owners of these cars might never have bought them, and so these suits might never have arisen, except for Ford's contacts with their home States. Those contacts might turn any resident of Montana or Minnesota into a Ford owner -- even when he buys his car from out of state. He may make that purchase because he saw ads for the car in local media. And he may take into account a raft of Ford's in-state activities designed to make driving a Ford convenient there: that Ford dealers stand ready to service the car; that other auto shops have ample supplies of Ford parts; and that Ford fosters an active resale market for its old

71

models."

592 U.S. at 365-67 (emphasis added). In his concurrence in the judgment,

Justice Alito makes the same point:

> "To say that the Constitution does not require the kind of proof of causation that Ford would demand -- what the majority describes as a 'strict causal relationship,' <u>ante</u>, at 362 -- is not to say that no causal link of any kind is needed. And here, <u>there is a sufficient link</u>. It is <u>reasonable to infer that the vehicles in question here would never have been on the roads</u> in Minnesota and Montana if they were some totally unknown brand that had never been advertised in those States, was not sold in those States, would not be familiar to mechanics in those States, and could not have been easily repaired with parts available in those States. See <u>ante</u>, at 367 (describing this relationship between Ford's activities and these suits). The whole point of those activities was to put more Fords (including those in question here) on Minnesota and Montana roads. The common-sense relationship between Ford's activities and these suits, in other words, is causal in a broad sense of the concept, and personal jurisdiction can rest on this type of link without strict proof of the type Ford would require. When 'arise out of' is understood in this way, it is apparent that 'arise out of' and 'relate to' overlap and are not really two discrete grounds for jurisdiction."

<u>Id.</u> at 373-74 (emphasis added). Justices Gorsuch and Thomas appear to

make a similar point. See <u>Ford</u>, 592 U.S. at 378.

Why did the Court refer to causation when it was not relying upon

the "arise out of" language in evaluating the nature of Ford's contacts

with Minnesota and Montana? And why did the Supreme Court signal

the use of a <u>theoretical causation standard</u> when it stated that the

plaintiffs "might never have bought" the subject vehicles absent Ford's extensive contacts with the forum states? I think here the Supreme Court is signaling the use of what I will call a "constructive causation" metric for answering such questions because such a metric provides both fairness to the out-of-state defendant while also protecting interstate federalism.

It was fair to subject Ford to specific personal jurisdiction for the plaintiffs' claims arising from the accidents at issue in that case because those accidents <u>could</u> have been caused by its contacts with the forum states. Ford should have anticipated being haled into court over this specific type of fact pattern. Likewise, each forum state had a legitimate interest in regulating conduct within its borders that <u>could</u> cause those accidents; thus the federalism interest was satisfied. Under such facts, a forum state is not overreaching or grabbing for cases.

Thus, constructive causation is another helpful metric -- a cross-check -- for the application of the full <u>Ford</u> test. Notably, both the main opinion and both concurrences in the judgment in <u>Ford</u> discuss some version of constructive causation having been met. Thus, in my view, if this constructive-causation standard is met, it is more likely that the

"relate to" test has been met.

### III. Conclusion

For the reasons stated above, I believe that "the most natural State" metric and the "constructive causation" metric can assist the bench and bar as they navigate how to apply the Supreme Court's new analytical framework for the "relate to" test for specific personal jurisdiction from <u>Ford</u>. However, I should not be understood as advocating that these metrics replace the "relate to" test or that they be viewed as additional elements of that test. Instead, my thoughts here should be understood only as encouraging the bench and bar to use these metrics as tools to confirm the results arising from the application of the full <u>Ford</u> test -- that is, to avoid "guessing" on how to apply the "relate to" test in cases with more complex fact patterns.

SELLERS, Justice (dissenting).

I respectfully dissent. The critical question on appeal is whether, for jurisdictional purposes, Cooper Tire & Rubber Company's Alabama-based conduct relates to Sheri Sawyer's claims. In my view, Cooper Tire's contacts with Alabama fall short of supporting specific personal jurisdiction; thus, the Fourteenth Amendment's Due Process Clause forbids this Court from exercising personal jurisdiction over Cooper Tire in this case.

To ensure that an exercise of specific personal jurisdiction accords with due process, courts apply a three-part analysis, inquiring: (1) "whether the nonresident defendant 'purposefully availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws"; (2) "whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum"; and (3) "whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" Louis Vuitton Malletier, S.A. v. Mosseri, 736 F.3d 1339, 1355 (11th Cir. 2013). Cooper Tire concedes that it has "purposefully avail[ed] itself of the privilege of conducting activities within [Alabama]." Hanson v. Denckla,

357 U.S. 235, 253 (1958). And neither party addresses the third prong of the analysis. Thus, this case requires us to review Cooper Tire's contacts with Alabama to determine whether Sawyer's claims "aris[e] out of or relate[] to" one or more of those contacts. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n.8 (1984).

The complaint and the affidavits filed by the parties reveal the following regarding Cooper Tire's contacts with Alabama. Cooper Tire sells its tires to 324 independently owned dealers across 117 cities. Between 2007 and 2014, it manufactured the subject tire model, the "Cooper CS4," and it does not deny that, during that time frame, it sold the Cooper CS4 to those dealers and "conducted extensive advertising and marketing campaigns for its passenger and light truck tires, including the [Cooper CS4]." Additionally, Cooper Tire collects warranty information and tire-failure data from Alabama consumers, "maintains an interest in a manufacturing facility in ... Alabama," "lists job postings for Tire Engineers in the Florence[] ... area," sponsors numerous University of Alabama-related and State of Alabama-centric sports programs, and cosponsors a teen driver and tire-safety campaign for Alabama teenagers.

76

Between 2015 and 2018, however, Cooper Tire shipped only 5,000 Cooper CS4 tires matching the subject tire's dimensions. None of those tires were shipped to Alabama. Indeed, Cooper Tire shipped no tires of any brand or size to either of the stores where the subject vehicle's owner purchased tires. And Cooper Tire did not directly sell tires to Alabama customers between 2015 and 2018.

Those contacts are a far cry from those that supported specific personal jurisdiction in Ford Motor Co. v. Montana Eighth Judicial District Court, 592 U.S. 351 (2021) -- "the most recent Supreme Court guidance on personal jurisdiction." Yamashita v. LG Chem, Ltd., 62 F.4th 496, 502 (9th Cir. 2023). In that case, Ford had employed "every means imaginable" to encourage Minnesotans and Montanans to purchase its vehicles, including, relevantly, the Explorer and Crown Victoria. Ford, 592 U.S. at 365. "And apart from sales, Ford work[ed] hard to foster ongoing connections to its cars' owners." Id. Ford's dealers consistently maintained and repaired Ford vehicles whose warranties were long expired, and Ford even "distribute[d] replacement parts both to its own dealers and to independent auto shops in [both states]." Id. In sum, Ford

sought not just one-time vehicle purchasers but "lifelong Ford drivers." Id.

Indeed, it was Ford's nonsale activities and used-market exploitation that made the exercise of specific personal jurisdiction reasonable. Specifically, one of the vehicles in <u>Ford</u> was the Crown Victoria, a model that, by the time of the accident and resulting litigation, had long since been discontinued. <u>See</u> note 10, <u>supra</u>. But because Ford had fostered the sale of its used vehicles through its dealerships and had put considerable effort into keeping the Crown Victoria on the road, the Supreme Court found reasonable a Minnesota court's exercising specific personal jurisdiction over Ford -- even though the specific Crown Victoria at issue originally had been sold outside the state. <u>See</u> <u>Ford</u>, 592 U.S. at 364-66.

The facts of this case are substantially different. Unable to draw a causal connection between the purchase of the subject tire and Cooper Tire's contacts with Alabama, Sawyer proceeds under the "back half" of the "arise out of or relate to" rule. <u>Id.</u> at 362 ("The first half of th[e] standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a

78

causal showing."). Thus, Sawyer must specifically show that one or more of Cooper Tire's contacts with Alabama relates to her claims. The evidence, however, does not support her. Of Cooper Tire's contacts with Alabama listed above, the only ones Sawyer can plausibly relate to her claims are that Cooper Tires: (1) sells its tires in Alabama to hundreds of dealerships in over a hundred cities; (2) manufactured and sold to dealers in Alabama the Cooper CS4 between 2007 and 2014; and (3) in that time frame, extensively advertised and marketed its tires, including the Cooper CS4. The majority opinion holds that those contacts are enough to support specific personal jurisdiction; I disagree. Sawyer's problem is that those contacts predate the sale of the subject tire, by which time Cooper Tire no longer shipped the Cooper CS4 into Alabama. What is missing here are two important activities present in <u>Ford</u>: (1) Cooper Tire's promoting a marketing plan to support additional sales and (2) Cooper Tire's fostering ongoing connections with its Cooper CS4 tires' owners by advertising the Cooper CS4 outside of its original sales between 2007 and 2014. Without any allegations that Cooper Tire engaged in some conduct that related particularly to the Cooper CS4 <u>at the time of the subject tire's sale to Barbara Coggin</u>, the owner of the

vehicle Sawyer's son was traveling in at the time of the accident, there can be no specific personal jurisdiction in this case. It is not enough that Cooper Tire sold the Cooper CS4 in Alabama for some period predating the sale of the subject tire and extensively marketed and advertised the Cooper CS4 during that period. And it is not enough that Cooper Tire continues to advertise, market, and sell other tire models in Alabama. See Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cnty., 582 U.S. 255, 264 (2017) ("[S]pecific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State."). More is needed. As the Supreme Court stated: "In the sphere of specific jurisdiction, the phrase 'relate to' incorporates real limits ...." Ford, 592 U.S. at 362. Those limits are supported by the facts of this case and precedent.

But, Sawyer has "'allege[d] facts that would support a colorable claim of jurisdiction'" such that jurisdictional discovery could be permitted. Ex parte Troncalli Chrysler Plymouth Dodge, Inc., 876 So. 2d 459, 468 (Ala. 2003) (quoting Schenck v. Walt Disney Co., 742 F. Supp. 838, 840 n.1 (S.D.N.Y. 1990)) (emphasis omitted). And, to this end, Sawyer even requested that the trial court grant her leave "to conduct

discovery on personal jurisdiction, or alternatively, compel Cooper Tire to respond to [her] previously-served jurisdictional discovery." In response and without objection, the trial court granted some limited discovery to establish where the subject tire was purchased and whether, between 2015 and 2018, Cooper Tire generally sold the same make, model, and size tire as the subject tire in Alabama. But now Sawyer contends that the trial court exceeded its discretion in so limiting the jurisdictional discovery she requested. I disagree.

"[W]e review for excess of discretion trial courts' decisions on the availability and scope of jurisdictional discovery." Pruitt v. AAA Interstate Transp., LLC, 358 So. 3d 1144, 1148 (Ala. 2022). Sawyer presented the trial court with two options: a general request for jurisdictional discovery or a request for jurisdictional discovery that included interrogatories, requests for production, and requests for admission regarding Cooper Tire's conduct in Alabama between 2017 and 2019. In exercising its discretion, the trial court split the difference between the two options Sawyer proposed: it expanded and shifted the time frame of discovery -- from the requested time frame of 2017-2019 to 2015-2018 -- while otherwise limiting the scope of discovery. In essence,

81

the trial court granted much of, if not more than, the jurisdictional discovery Sawyer requested. Thus, Sawyer cannot show, and I cannot agree, that the trial court exceeded its discretion by limiting the scope of the jurisdictional discovery in this case.